IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CYRUS BROOKS,

                        Plaintiff,                              OPINION AND ORDER

        v.                                                           20-cv-05-wmc

DR. KARL HOFFMAN,
DR. SALAMULLAH SYED,
NURSE SHELLI JAROCKI,
PAMELA SCHMIDT and
SARA FRY,

                        Defendants.

_Pro se_ plaintiff Cyrus Brooks contends that while he was incarcerated at Columbia Correctional Institution ("Columbia"), staff consciously disregarded his need for medical attention for his lower back injury, foot conditions, and pain. The court granted Brooks leave to proceed on Eighth Amendment deliberate indifference claims against Dr. Karl Hoffman, Dr. Salamullah Syed, Nurse Shelli Jarocki and Special Needs Committee members Pamela Schmidt and Sara Fry, for allegedly mishandling Brooks' medical conditions between 2014 and 2016. Now before the court is defendants' motion for summary judgment. (Dkt. #34.) For the following reasons, the court will grant summary judgment to defendants Hoffman, Syed, and Jarocki, although the claims against defendants Schmidt and Fry must proceed to trial. Brooks has also filed a motion for recruitment of counsel (dkt. #61), which the court will deny at this time.

UNDISPUTED FACTS[1]

A.      Background

During the relevant time frame, all defendants worked for the Wisconsin Department of Corrections (DOC") at Columbia.  Drs. Hoffman and Syed were physicians in Columbia's Health Services Unit ("HSU"), where Jarocki was a nurse clinician.  Schmidt was an Americans with Disabilities Act ("ADA") Coordinator and a member of the HSU's Special Needs Committee.  Finally, Sara Fry was a unit supervisor who also served as a member of the Special Needs Committee ("SNC").

Much of Brooks' dissatisfaction with his medical treatment by defendants arises from their denials of his requests for specific footwear, which are governed by the DOC's policies concerning shoes.  Just like other DOC facilities, Columbia has a process for inmates to request special needs items and restrictions, including specialized shoes to address a medical issue.  Specifically, Columbia's SNC must review such requests and determine whether an inmate requires a medical restriction or has a special need based on medical necessity.  The SNC is comprised of one or more members who review relevant medical records and determine if an item or restriction is medically necessary, and include one or more staff representatives from the HSU, a security staff representative, and a non-

---

[1] Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record evidence as appropriate.  Brooks objects to certain document cites as improperly authenticated, but he submits no evidence that the documents cited are not what defendants have purported them to be by sworn affidavit.  (*See* dkt. ##40-43.)  As such, those objections are summarily overruled.  Brooks also purports to dispute many of defendants' proposed findings of fact with arguments or general disagreement, which the court generally overrules except as they relate to Brooks' opposition to defendants' motion in the opinion section.

security staff representative.

Under Division of Adult Institution's Policy and Procedure 309.20.03, an inmate is allowed: one pair of ordinary, state-issued boots and two pairs of personal shoes per calendar year; and personal property that does not exceed $75 in value. The institution will not issue, purchase, or authorize "special shoes" if the inmate can wear regular, state-issued shoes that can be purchased from an approved vendor. (Dkt. #54 at ¶ 53.) Moreover, if an inmate can purchase a requested item from an approved vendor, the inmate may not order from a non-approved vendor. Finally, if the inmate requires shoes from a non-approved vendor catalog, the inmate must submit a request to the SNC. Regardless of where the shoes come from, certain shoes are not allowed because some colors or styles can denote gang affiliations or create other security issues.

### B.   Brooks' treatment and recommendations for foot conditions

In 2013, plaintiff Brooks requested wide-width shoes and was told to order them through an approved catalog. In May of 2014, Brooks complained that he had been suffering from worsening foot pain for two years, and was seen by various medical providers. He was evaluated by physical therapy and treated for six weeks for plantar fasciitis, with a possible referral to podiatry. Plantar fasciitis is the inflammation of the ligament that connects the heel bone to the toes, causing heel pain, and is typically treated with rest, ice, and over-the-counter pain medications. Consistent with this treatment, Brooks received naproxen and acetaminophen, as well as access to ice twice a day for 30 minutes to relieve the pain. In June of 2014, as Brooks was completing six weeks of physical therapy, he also received a night splint to be worn for three months to help stretch

3

the inflamed ligament and reduce pain.  He was scheduled for a follow-up in two months.  However, Brooks' pain continued beyond physical therapy, so he was referred to podiatry.

On July 25, 2014, Dr. Hoffman reviewed Brooks' prescriptions and renewed his antidepressant, anti-acid and Vitamin D medications, and his amitriptyline for chronic pain.  At that time, Brooks did not request any additional pain medications for his feet.  Two months later, Brooks had a podiatry appointment for his plantar fasciitis and his ice order was renewed for three months.

In October, Brooks was seen by Dr. Smith at the UW Health Clinic for his plantar fasciitis and posterior tibial tendinitis.  Dr. Smith recommended:  (1) sending Brooks to Aljans (a company that provides special shoes and orthotics) for athletic shoes and custom orthotics; (2) ice daily for 10-15 minutes; (3) daily stretching; (4) physical therapy with iontophoresis (a procedure that uses a mild electric current that acts like a cortisone injection); (5) that Brooks wear support shoes at all times; and (6) that Brooks use behind-the-counter pain medications as needed.  When outside physicians make recommendations about an inmate, the DOC treating physician reviews those recommendations and may adopt or reject them based on the treating physician's medical judgment and security and other institutional concerns.

Dr. Hoffman reviewed Dr. Smith's recommendations and forwarded a recommendation for supportive shoes and custom orthotic inserts to the SNC for review.  Dr. Hoffman did not have the authority to grant or order the shoes or orthotics.  Although Brooks contends that Dr. Hoffman did have such authority, he does not submit evidence to dispute Dr. Hoffman's and Fry's attestations to the contrary.  (*See* Hoffman Decl. (dkt.

#37) ¶ 22; Fry Decl. (dkt. #40) ¶ 7.)  Also, health services policy and procedure 300:07 states that "[p]rescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for specific items."  (Ex. 1006 (dkt. #42-1) 2.) On October 10, 2014, the SNC approved Brooks for Aljans supportive athletic shoes with custom orthotics.  When Dr. Hoffman met with Brooks later in October, Brooks reported that he would stop wearing the night splint and was seeing some improvement with physical therapy.  When Dr. Hoffman next saw Brooks on December 17, 2014, he did not bring up foot pain during this visit.

In January of 2015, Dr. Smith met with Brooks again for his plantar fasciitis and left toe bunions.  Dr. Smith made additional recommendations, including:  (1) sending Brooks to Aljans for custom orthotics; (2) allowing Brooks to order supportive athletic shoes from an outside vendor; (3) allowing him to always wear his personal shoes, including for off-site visits; (4) daily ice and stretching; (5) no barefoot walking; and (6) naproxen for foot pain as needed.  Dr. Smith also advised that Brooks not return to podiatry until he received custom orthotics.

Although Dr. Hoffman attests that he did not review Smith's recommendations, he still made orders related to Brooks' feet.  On January 25, 2015, the SNC further approved Brooks for no work, no recreation, and no going barefoot, and for continuous use of his personal shoes when out of bed, an extra pillow, ice BFO shoe inserts and Aljans supportive athletic shoes with custom orthotics.  He was also approved for a muscle relaxer and ibuprofen for pain and inflammation.

On February 17, 2015, Dr. Hoffman also ordered: physical therapy to measure

5

Brooks' leg length for any discrepancy; athletic shoes from Aljans; and continued stretching and use ice on his feet for another six months.  Then, on February 26, Dr. Hoffman amended the shoe restriction to include the $75 personal property restriction, if needed, and referred that order to the SPN.

On February 24, 2015, Brooks contacted Health Service Unit Manager ("HSM") Mashak about purchasing shoes from an outside vendor with no limit on the shoe price. On March 5, the SNC received that request, and defendants Schmidt and Fry and a non-defendant, Nurse Diane DeJaeger, handled that request for the SNC, which denied the request because Brooks did not "meet criteria."  (*See* dkt. #40-3.)  Although not reflected in the SNC's denial at that time, Brooks had possessed athletic shoes with custom orthotics from Aljans since October of 2014.  (*See* ex. 1007 (dkt. #41-1) 9.)  Fry attests that she was involved in the discussion of whether Brooks' request met the institution's security needs and the DOC's policies and procedures.  Fry further attests that she deferred to Nurse DeJaeger on whether the shoes were necessary for Brooks' condition because she was not qualified to make that medical judgment.

On March 13, 2015, Brooks wrote to the SNC and HSM Mashak to update his special needs restriction to exceed the $75 limit, and on March 26, he wrote again regarding the denial of his shoes.  On March 31, Mashak explained in a letter to Brooks that she reviewed the recommendations from Dr. Smith, but Aljans did not specify that Brooks needed special shoes or needed to exceed the $75 limit to order shoes from their approved catalog.

On April 13, 2015, Dr. Hoffman again met with Brooks and noted that he had a

6

leg length discrepancy, tibial tendonitis, left hallux valgus and pes planus, and recommended contacting podiatry for further evaluation. The next day, Dr. Hoffman approved Brooks to order a shoe that would fit his orthotics, although this request was still subject to SNC's approval. Unfortunately, in April or May of 2015, Dr. Hoffman was transferred to a different institution, and the record does not show that he was subsequently involved in Brooks' treatment for his foot issues, as opposed to his back injury as discussed separately below.

Instead, Dr. Syed next met with Brooks in June of 2015, at which time he asked to go back to his podiatrist and reported that he needed an operation. Dr. Syed told Brooks there was no need to go back to the podiatrist because he could try wider shoes, nor was there a need for surgery based on the podiatrist's notes. Brooks then apparently became irritated and left the room. Moreover, although Dr. Syed renewed Brooks' ibuprofen prescription as needed for six months, he discontinued a higher dose that had been prescribed a few months before by Hoffman.

In mid-July of 2015, Brooks next wrote to Dr. Smith about his attempts to obtain personal shoes from an outside vendor, explaining that Dr. Hoffman advised her to revise her recommendation to remove the cost limit and to include shoes that had bubbles or shocks. Dr. Smith's office responded by modifying the recommendation to say that: (1) Brooks should be able to purchase shoes from an outside vendor without limit to cost; (2) he should be permitted to order boots, rather than use the state-issued boots; (3) he should be allowed to wear personal shoes continuously, including off-site visits; and (4) he should ice and stretch daily, as well as avoid going barefoot. Dr. Syed reviewed the

recommendations a week later and approved all of Dr. Smith's recommendations on July 28, which he then forwarded to the SNC for review.  On August 7, 2015, Brooks wrote to Dr. Syed following up regarding his ability to purchase shoes, and Dr. Syed told Brooks that the administration and security would need to approve any recommendation for shoes from an outside vendor before a purchase can proceed.

On August 13, 2015, the SNC had another meeting, in which defendants Schmidt and Fry, along with a non-defendant, Nurse K. DeYoung, denied Brooks' request to purchase shoes from an outside vendor without a spending limit.  The reason provided for this denial was that Brooks could "purchase shoes from [an] approved vendor and remain within DOC guidelines."  (Dkt. #40-4.)  Fry acknowledges contributing to the SNC discussion with respect to whether Brooks' request could be approved based on the DOC's policies and procedures, but ultimately deferred to DeYoung.

On September 25, 2015, HSM Mashak then wrote to Brooks, explaining that Dr. Syed's July 28 shoe order had been forwarded to the SNC, which denied it on August 13 as it did not meet criteria.  Brooks followed up with Mashak about the denial, and Mashak advised Brooks to order the shoes he needed from an approved vendor catalog.  On October 27, Dr. Syed also met with Brooks, who asked about his shoe restrictions.  Dr. Syed again referred Brooks to the SNC because he did not have the authority to order the shoes Brooks was seeking.

About a year later, on August 18, 2016, Dr. Syed met with Brooks once again, who reported continued frustration about his shoe issue.  The Health Services Manager at the time again addressed Brooks' concern about his shoes, and Dr. Syed continued to order

Tylenol and ibuprofen for Brooks' pain.

Some six months later, on February 22, 2017, after Brooks was transferred to a different institution, Brooks was seen by a nurse for his back and foot pain. After Brooks described his previous MRI and continued discomfort from walking, he asked to be seen by a provider. Apparently after reviewing MRI results from 2015, the nurse told Brooks that he could purchase his own shoes, although it is unclear whether the purchase cap was discussed.

### C.    Brooks' lower back injury and treatment by Dr. Hoffman and Jarocki

On January 24, 2015, Brooks also injured his back while playing basketball. The next day, a non-defendant, Dr. Springs, authorized Brooks to be sent to the emergency room for evaluation. He then received a Toradol injection, a nonsteroidal anti-inflammatory drug, and cyclobenzaprine, a muscle relaxant to alleviate his pain and to be taken for 14 days. (Ex. 1000 (dkt. #43-1) 26.) Dr. Hoffman reviewed and agreed with those prescriptions. Brooks also received ice and heat, to be applied alternatively multiple times daily, an extra pillow, and rest restrictions of no work or recreation for three weeks.

When Brooks returned from the emergency room, he also had a bubble pack of Vicodin pills from the emergency room physician. Correctional officers gave HSU staff the Vicodin pills to hold until Dr. Hoffman reviewed that order, which upset Brooks to the point that officers had to restrain him and take him to his cell. On February 3, 2015, Dr. Hoffman ordered Tylenol #3 and ibuprofen for Brooks' pain. According to Brooks, this delay left him without any pain medication between January 25 and February 3.

Brooks continued to take Tylenol #3 for pain management, but refused to take

another medication, amitriptyline, generally prescribed to treat major depression and a variety of pain syndromes.[2]  According to defendant Nurse Jarocki, amitriptyline would have helped with his pain, but Brooks contends that this medication caused mood swings. Jarocki explains that Brooks also had access to cyclobenzaprine, a muscle relaxer, but Brooks rarely took it even though Dr. Hoffman had allowed it.

On January 28, 2015, Brooks also submitted a Health Services Request ("HSR"), which complained that although he was injured on January 24, he was not sent to the hospital until the next day, and that he was still in severe pain.  Nurse Jarocki responded on January 29, noting that Brooks saw a doctor that same day, although this was an obvious error since Brooks had been seen on January 25.  The next day, the 30th, Brooks was evaluated by a nurse for lower back pain, who directed him to continue with rest, ice, ibuprofen, and back exercises, while also submitting a referral for an MRI, physical therapy, and a school/work release.

Dr. Hoffman next met with Brooks on February 3, 2015, after which he ordered him to receive:  Tylenol #3 for 10 days; ibuprofen for six months; and an urgent lumbar spine MRI, which was approved and forwarded to the scheduler that same day.  Dr. Hoffman also noted that because Brooks reported losing urine involuntarily, it was possible that he was suffering from a cauda equina syndrome, a serious condition that can be caused by a herniated disc compressing the nerves coming down the end of the central spinal canal.

On February 25, 2015, Brooks received an MRI for his lower back, and on March

---

[2] *See* Amitriptyline, https://en.wikipedia.org/wiki/Amitriptyline; *see also* Antidepressants: Another weapon against chronic pain, https://www.mayoclinic.org/pain-medications/art-20045647 (Sept. 7, 2019).

5, Dr. Hoffman had a follow-up visit with Brooks about his back pain.  Brooks reported that his urinary incontinence and radicular pain had improved substantially, but he remained very frustrated with the DOC medical system.  Dr. Hoffman noted that the MRI report indicated that: he had disc herniations and central disc protrusions, with no associated central canal or neural foraminal stenosis; and the protruded disc contacted but did not displace or compress certain nerve roots.  Dr. Hoffman then renewed Brooks' ice order for his lower back for two more months and increased his acetaminophen.  In doing so, Brooks now attests that he did not believe Brooks needed more aggressive pain control or needed surgery at that time because his worrisome symptoms were steadily resolving.  Dr. Hoffman further attests that conservative treatment was appropriate since the MRI ruled out cauda equina syndrome.

On March 30 and April 13, Dr. Hoffman followed up with Brooks about his low back pain.  During the April appointment, Brooks still complained of pain, but Dr. Hoffman noted that:  his functioning was improving; he could walk further; and he was able to easily move and climb on the exam table.  Dr. Syed and other DOC providers continued to treat Brooks for his back and foot issues.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient for a reasonable jury to find the existence of an element essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, then to survive summary judgment, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party."  *Trade Fin. Partners,*

*LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Defendants seek summary judgment on the merits of Brooks' claims and on qualified immunity grounds.  Apart from defendants Schmidt and Fry, defendants' arguments are well-taken.

## I.   Plaintiff's Eighth Amendment Claims

Plaintiff claims that defendants provided inadequate medical care.  The Eighth Amendment recognizes a prisoner's right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is "serious" if it:  so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" is an even higher standard; it means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v.*

*Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  Disagreement between two medical professionals, without more, is insufficient to establish an Eighth Amendment violation.  *Pyles*, 771 F.3d at 409.  The court looks at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

### A.    Dr. Hoffman

To begin, Brooks maintains that Dr. Hoffman failed to exercise any medical judgment and left him in severe foot and back pain, but the evidence of record suggests the contrary.  At each point of interaction with Brooks, Dr. Hoffman submitted orders or prescribed Brooks medical pain interventions, all of which involved the exercise of medical judgment.  Plus, in October of 2014, he accepted Dr. Smith's recommendations that: Brooks be sent to Aljans for custom orthotics; and Brooks to be allowed to order supportive athletic shoes from an outside vendor.  Then, consistent with policy, Dr. Hoffman forwarded the request that Brooks receive supportive shoes to the SNC.  Similarly, in February of 2015, Dr. Hoffman amended his recommendation about supportive shoes to address the $75 property value limit for SNC's review.  Moreover, at that point, Dr. Springs had not recommended that Brooks be allowed to purchase shoes in excess of that limit, so Hoffman did not disregard any such recommendation.

Then, in April of 2015, Dr. Hoffman further requested that Brooks be allowed to order shoes that would fit his orthotics, a recommendation also subject to SNC approval. Dr. Hoffman also recommended that Brooks see a podiatrist for further evaluation.  None of these referrals suggest that Dr. Hoffman ignored or mishandled Brooks' foot conditions. To the contrary, Dr. Hoffman repeatedly recommended that Brooks receive supportive shoes and other appropriate interventions to address his foot conditions.  To the extent that the SNC refused to heed Dr. Hoffman's recommendation that Brooks be allowed to purchase supportive shoes from an outside vendor, that is not grounds to hold Hoffman liable.  *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("no prisoner is entitled to insist that one employee do another's job").

The same is true for Dr. Hoffman's treatment of Brooks' back injury.  To begin, Dr. Hoffman exercised medical judgment in prescribing Tylenol #3, rather than allowing Brooks to continue taking the Vicodin prescribed at the emergency room.  In addition, Hoffman explains that he did not believe narcotics were an appropriate option for Brooks' pain because:  (1) caution should be exercised in prescribing any narcotic, which is best reserved for patients who cannot tolerate acetaminophen or NSAIDs; and (2) even if opioids are appropriate for lower back pain, their use should be limited to just three to seven days.  Moreover, Brooks' disagreeing with Dr Hoffman's opinion does not support a finding that Hoffman acted with deliberate indifference. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).  Indeed, with respect to his decisions involving pain medications in an institutional setting, Dr. Hoffman is entitled to considerable deference, especially when it comes to the use of a narcotic medication like Vicodin, even when another doctor

14

prescribed it. *E.g.*, *Burton v. Downey*, 805 F.3d 776, 785-86 (7th Cir. 2015) (doctor's refusal to prescribe narcotic did not violate detainee's constitutional rights despite another doctor's prescription for it); *see also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations"). Finally, the evidence shows Brooks took the Tylenol #3, and he has submitted no evidence that it was ineffective. Thus, Brooks has wholly failed to show that prescribing Tylenol #3 was blatantly inappropriate, much less evidence of deliberate indifference.

Brookes separately claims Dr. Hoffman improperly delayed his access to adequate pain medication by not placing an order for Tylenol #3 until ten days after Brooks returned from the emergency room. However, no record evidence suggests Dr. Hoffman was aware that Brooks had visited the emergency room, or that there were prescription orders awaiting his review during that time. Further, another doctor, a non-defendant named Springs, sent Brooks to the emergency room, and the record does not show that Dr. Hoffman was at the institution when Brooks returned with Vicodin. Rather, correctional officers turned the Vicodin over to HSU staff. In addition, Brooks had other pain medications available to him before Dr. Hoffman prescribed the Tylenol #3, including ibuprofen, naproxen, amitriptyline, and cyclobenzaprine. While Brooks declined to take those medications and argues that they would not address his pain, because cyclobenzaprine is a muscle relaxer and amitriptyline is a mood elevator with unpleasant mood swings, he is not a medical provider. Thus, his assertion that these medications could not have addressed his pain does not show they would have been ineffective.

15

Likewise, no evidence of record shows that Brooks had attempted to take those medications as prescribed and they did not address his pain.  Finally, and most importantly, Brooks offers no evidence that Dr. Hoffman was aware Brooks was declining to take those medications after his return from the emergency room, nor aware of any delay in prescribing the Tylenol #3.

Separately, there is also no basis for a reasonable jury to find that Dr. Hoffman consciously disregarded Brooks' suspected causa equina syndrome.  On the contrary, when Brooks presented with symptoms suggesting he was suffering from that rare condition, Dr. Hoffman promptly ordered an MRI.  Even when that screening ruled out causa equina syndrome, Dr. Hoffman still met with Brooks on March 5, 2015, only to learn his functioning had improved.  And while Brooks still experienced discomfort because of disc herniations and protrusions, Dr. Hoffman did not ignore that pain either; he continued to prescribe ice and increased Brooks' acetaminophen.  Moreover, during March and April 2015 follow-ups, Dr. Hoffman continued to note improvement in Brooks' functioning, which he does not dispute.  Thus, because no evidence of record suggests that Dr. Hoffman failed to exercise medical judgment in responding to Brooks' foot conditions, back injury or associated pain, Dr. Hoffman is entitled to summary judgment on the merits of this claim against him as well.

**B.   Dr. Syed**

None of Dr. Syed's treatment decisions suggest deliberate indifference either.  In fairness to Brooks, Dr. Syed's first interaction with Brooks in June of 2015 was perfunctory, but not in a manner approaching deliberate indifference to Brooks' foot conditions.

Rather, the records shows that a few months prior, Dr. Hoffman had recommended Brooks return to a podiatrist to address his ongoing foot issues.  Despite that recommendation, Dr. Syed told Brooks a podiatry referral was unnecessary because:  (1) he thought that Brooks should try a wider shoe at that point; and (2) he disagreed with Brooks that surgery was necessary.  Certainly, Dr. Syed might be faulted for refusing to accept Dr. Hoffman's referral, but disagreement between two physicians is *not* evidence of deliberate indifference by itself.  *Pyles*, 771 F.3d at 409.  In addition, *no* evidence of record supports an inference that Dr. Syed's recommendation for a wider shoe was blatantly inappropriate; Brooks had tried wider shoes and found they were ineffective; or that *any* provider believed that surgery was an appropriate next step.  In addition, the evidence shows that Dr. Syed did not ignore Brooks' pain; instead, he continued his ibuprofen prescription, albeit at a lower dose, for the next six months.  Although Dr. Syed does seem to have brushed off Brooks' requests for more aggressive treatment at that point, he exercised medical judgment by recommending different footwear and modifying Brooks' pain medication.  At worst, Dr. Syed may have failed to explicitly consider Dr. Hoffman's podiatry recommendation, which could demonstrate negligence, or even gross negligence, but not a constitutional violation.  *See Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment).

Regardless, after Dr. Syed's initial interaction, Brooks reached out directly to Dr. Smith, who in mid-July recommended a series of interventions for Brooks' feet, *all* of which Dr. Syed accepted.  Indeed, Dr. Syed not only accepted all of Dr. Smith's

recommendations, but then forwarded the request that Brooks be allowed to order shoes from an outside vendor without the $75 cap to the SNC for its review. Like Dr. Hoffman, there is also no dispute that Dr. Syed could not order Brooks the shoes he was requesting at that point; the SNC had to approve Brooks' request for that type of shoe, especially if no cap applied to the amount of his purchase. While Dr. Syed did subsequently field Brooks' grievances about the SNC's decision to deny his request to purchase shoes from an outside vendor, he again responded by referring Brooks to the SNC. Although Dr. Syed did not continue to press the SNC to change its decision, he did what was within his power.

Dr. Syed's last interaction with Brooks during the relevant time frame was in 2016, at which point Dr. Syed ensured that Brooks still had access to Tylenol and ibuprofen. No evidence suggests that Dr. Syed ignored any new or worsening symptoms at that point such that another medication regiment might have been necessary. And while Brooks had continued to express frustration about the shoe issue, Dr. Syed was unable to change the SNC's decision. Accordingly, Dr. Syed is entitled to summary judgment because, in viewing the totality of his care of Brooks' foot issues, no reasonable trier-of-fact could conclude that he consciously disregarded any serious medical needs.

### C. Nurse Jarocki

Defendant Nurse Jarocki is also entitled to summary judgment because there is *no* evidence that she denied or delayed any medical attention for Brooks. There is no dispute that Nurse Jarocki made a mistake in her January 29 response to Brooks' January 28th HSR, in which he complained about the delay in sending him to the hospital and reporting severe pain. Indeed, had she not mistakenly believed that Brooks had been seen on January

29, Jarocki likely would have forwarded Brooks' HSR to an advanced care provider, who in turn could have prescribed Brooks additional medication sooner.  Still, as discussed, there is no dispute that Brooks had access to cyclobenzaprine and amitriptyline for his pain at the time he submitted the January 28th HSR.  Regardless, Jarocki's error might suggest negligence, or even gross negligence, but there is *no* evidence from which a reasonable jury could find that she consciously disregarded or acted with deliberate indifference to Brooks' pain.  Therefore, Jarocki is entitled to summary judgment on the merits of the claim against her as well.

### D. Schmidt and Fry

Finally, defendants Schmidt and Fry seek summary judgment because Brooks could have ordered shoes from an approved vendor, Aljans, from the approved catalog so long as he stayed within the $75 property value limit.  In opposition, Brooks argues that the SNC's decisions improperly parted ways with three physicians' joint recommendations.  Specifically, Dr. Smith, Dr. Hoffman, and Dr. Syed had all unanimously agreed that Brooks should be allowed to purchase supportive shoes from an outside vendor, and then Dr. Spring and Dr. Syed further recommended that Brooks be allowed to purchase shoes from an outside vendor *in excess of* the $75 limit.  On this record, neither Schmidt nor Fry are entitled to summary judgment.

The starting point in evaluating the SNC's decisions in March and August of 2015 is Brooks' medical providers' existing recommendations.  There is no reasonable dispute that by March, Dr. Smith, a podiatrist entitled to deference by all other medical providers, as well as Drs. Hoffman and Syed had all agreed Brooks should be able to buy shoes from

19

an outside vendor, and by August, Drs. Smith and Syed further agreed that the price limit should not apply.  Neither the SNC's decisions nor any other evidence of record indicates that in denying Brooks' shoe requests, defendants Schmidt or Fry, as members of the SNC, actually considered those recommendations.  Nor do the SNC's decisions explain *why* Brooks did not have a qualifying medical need for the requested shoes, which he obviously did given those unanimous recommendations.  Instead, the one-page SNC decision forms simply include a statement that Brooks *either* did not meet the criteria for the request *or* could purchase shoes from an approved vendor.

More problematic still, even now neither Schmidt nor Fry provide any explanation for not considering those recommendations before denying his requests, other than deliberate indifference to a consensus of medical opinions.  Rather, defendants point to HSM Mashak's March 2015 letter to Brooks, in which she wrote that after he was sent to Aljans for shoes, Aljans neither specified that Brooks needed special shoes nor needed to exceed the $75 limit.  Moreover, defendants suggest that since Aljans had a catalog of shoes, it would have recommended shoes that exceeded the property limit value if it felt he needed a more expensive pair.  Even ignoring that Schmidt does *not* attest that Mashak's after-the-fact explanation captured the SNC's actual reason for the denial, the record indicates that:  (1) Aljans is a specialty shoe vendor, *not* a medical provider; (2) no evidence shows that Brooks went to Aljans for a fitting after 2014; (3) *no* podiatrist or physician who fitted him for orthotics ever determined that Aljans' shoes were appropriate to address Brooks' various painful conditions, as recognized by three other doctors, one a specialist.

20

Therefore, the current evidence of record strongly suggests that the SNC had *no* medical or security-related basis to reject the recommendation of the medical providers that Brooks be allowed to order supportive athletic shoes beyond the $75 limit. Moreover, in February of 2017, after Brooks was transferred to a different institution, the record shows that he was finally allowed to purchase his own shoes when a nurse reviewed his MRI results from 2015, seemingly without issue. (*See* Ex. 1000 (dkt. #43-1) at 51-52.) Nor have defendants submitted *any* evidence suggesting that the DOC property and shoe policies changed or were different at Brooks' new institution, or that Brooks' condition had worsened by that point. Construing this evidence in a light most favorable to Brooks, including his later ability to order his own shoes, suggests that he should have been able to do so back in 2015 at Columbia.

That leaves the question of who on the SNC can be held accountable for these denials. On the record before the court, a reasonable trier-of-fact could conclude that Schmidt, who attests that she concluded that Brooks' medical condition did not warrant shoes from an outside vendor, consciously disregarded Brooks' serious medical need in denying his requests despite Dr. Smith's, Dr. Hoffman's, and Dr. Syed's unanimous recommendations to the contrary. Therefore, Schmidt is not entitled to summary judgment on the merits of this claim.

As for Fry, she submitted evidence about her expertise and her specific role in SNC meetings, attesting that her involvement was limited to explaining DOC procedures, and that she deferred to the medical expertise of the SNC members that were medical professionals. Although Fry does not detail what her recommendation was, or if she even

made a recommendation, it is apparent that the SNC's decision was not security related. And even as a non-medical professional, Fry was not free to defer to fellow SNC members DeJaeger and Schmidt's medical expertise in the face of overwhelming evidence of a denial of care amounting to "mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Therefore, Fry's motion for summary judgment will also be denied.[3]

In sum, only the claims against defendants Schmidt and Fry will proceed to trial. Given that these claims are so narrow, the parties may be interested in reaching out to Deputy Clerk of Court Weisman for mediation.

## II. Motion for recruitment of counsel (dkt. #61)

Finally, Brooks has filed a motion for recruitment of counsel for purpose of trial because: the medical records in this case have not been properly signed; he is unable to interview the witnesses in this case because of his confinement; and this case involves complex medical care questions. (Dkt. #61.) Having reviewed Brooks' summary judgment submissions, the court finds that he is capable of representing himself for purposes of trial. To start, there is no rule that prisoners challenging the adequacy of their medical care are entitled to counsel. *See Williams v. Swenson*, 747 F. App'x 432, 434 (7th Cir. 2019) (affirming district court's denial of request for counsel in medical care case). Moreover, the remaining claims proceeding to trial involve a narrow question about why defendants

---

[3] Defendants' qualified immunity defense fails as well because there is no question that Brooks' right to proper, medically necessary footwear was clearly established by 2015. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (Eighth Amendment requires prison officials to provide inmates with adequate food, clothing, shelter, and medical care).

Schmidt and Fry ignored the unanimous consensus of the three medical doctors familiar with his need for better footwear.  Thus, Brooks' ability to succeed on this claim is unlikely to require additional medical expertise or the ability to interview many witnesses.  *See Redman v. Doehling*, 751 F. App'x 900, 905 (7th Cir. 2018) ("Redman could litigate his claims himself because they turned on historical facts as opposed to medical evidence.").

In addition, Brooks is well-familiar with the legal principles governing his claims; indeed, his arguments as to Schmidt and Fry succeeded.  Further, along with this opinion and order, the court will issue its Trial Preparation Order, which sets out the remaining deadlines and provides guidance about how the trial will proceed as well as this court's procedures.  Brooks should be able to use that order to help him prepare for trial along with the court's additional guidance provided during the final pretrial conference.  Accordingly, the court will deny Brooks' motion, and he will proceed to trial *pro se*.

23

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #34) is GRANTED as to

defendants Hoffman, Syed, and Jarocki, but DENIED as to Schmidt and Fry.

2) Plaintiff Cyrus Brooks' motion for recruitment of counsel (dkt. #61) is

DENIED.

Entered this 12th day of September, 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24